

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00205-CV

**IN RE COMMITMENT OF** Ryan **RODRIGUEZ**

From the 454th Judicial District Court, Medina County, Texas
Trial Court No. 23-04-28328-CV
Honorable Daniel J. Kindred, Judge Presiding

Opinion by:     Adrian A. Spears II, Justice

Sitting:     Lori I. Valenzuela, Justice
         Adrian A. Spears II, Justice
         H. Todd McCray, Justice

Delivered and Filed: June 4, 2025

AFFIRMED

After a jury trial, Ryan Rodriguez was found to be a sexually violent predator and was civilly committed for sex-offender treatment and supervision. He brings three issues on appeal: (1) whether the evidence is legally and factually sufficient to support the jury's finding that he is a sexually violent predator; (2) whether the trial court abused its discretion in admitting evidence of unadjudicated offenses over his objections pursuant to Texas Rules of Evidence 403 and 705(d); and (3) whether the trial court abused its discretion in refusing to give a contemporaneous Rule 705(d) limiting instruction at the time the State's expert testified. We affirm the trial court's judgment and order of commitment.

**SUFFICIENCY OF THE EVIDENCE**

A jury unanimously determined beyond a reasonable doubt that Rodriguez is a sexually violent predator pursuant to the Sexually Violent Predators Act ("SVP Act"). *See* TEX. HEALTH & SAFETY CODE §§ 841.001-.153. In conformity with the verdict, the trial court civilly committed him. On appeal, Rodriguez argues the evidence is legally and factually insufficient to support a finding beyond a reasonable doubt that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

"A commitment proceeding under the SVP Act is the unusual civil case incorporating the 'beyond a reasonable doubt' burden of proof typically reserved for criminal cases." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020). Thus, when conducting a legal sufficiency review of a determination that an individual is a sexually violent predator, we use the same legal sufficiency standard applied in criminal cases. *See In re Commitment of Mullens*, 92 S.W.3d 881, 885 (Tex. App.—Beaumont 2002, pet. denied). Accordingly, we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the elements required for civil commitment as a sexually violent predator beyond a reasonable doubt. *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is the jury's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id*. at 887 (citations omitted). "The jury may resolve conflicts and contradictions in the evidence by believing all, part, or none of the witnesses' testimony." *Id*.

With regard to factual sufficiency, we consider whether, in light of the entire record, "the disputed evidence a reasonable factfinder could not have credited in favor of" the finding that a person is a sexually violent predator, "along with undisputed facts contrary to [that finding], is so

significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met." *In re Commitment of Stoddard*, 619 S.W.3d at 678. Once again, "[i]n doing so, [we] may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and [we] must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *Id*. at 668.

To establish that an individual is a sexually violent predator, the State must prove that the individual (1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. TEX. HEALTH & SAFETY CODE § 841.003(a). Under the first element, a person is a "repeat sexually violent offender" if "the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses[.]" *Id*. § 841.003(b). Rodriguez does not dispute the sufficiency of the evidence to support this first element, and the undisputed evidence shows that his June 15, 1992 conviction for sexual assault and his January 8, 2014 conviction for aggravated sexual assault of a child were sufficient to prove that he was convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *See id*. § 841.003(b).

Under the second element, a "[b]ehavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id*. § 841.002(2). A "predatory act" is defined as "an act directed toward individuals, including family members, for the primary purpose of victimization." *Id*. § 841.002(5). On appeal, Rodriguez challenges the legal and factual sufficiency of the evidence to support this second element.

At trial, Dr. Michael Arambula, a medical doctor who is board certified in both general psychiatry and forensic psychiatry, testified that he evaluated Rodriguez and determined Rodriguez suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence. In conducting his evaluation, Dr. Arambula considered many factors, such as Rodriguez's developmental history, social history, education, relationships, occupations medical, surgical, pharmacologic and psychiatric history. Dr. Arambula also evaluated Rodriguez's sexual offenses, which included information from Rodriguez, as well as records to determine how much force was used, the circumstances, what happened afterwards, and then why the sexual offense reoccurred. Further, Dr. Arambula utilized the Diagnostic and Statistical Manual ("DSM"), which is a textbook published by the American Psychiatric Association that contains the criteria of major mental illnesses established by research and reviewed by a committee.

According to the records Dr. Arambula reviewed and relied upon, Rodriguez was convicted of two sexual offenses and was also arrested on allegations of sexual offenses that did not result in a conviction. According to Dr. Arambula, in making his evaluation, a review of older information and past offenses–whether or not they led to a conviction–is important to determine "how a medical condition behaves over time." Dr. Arambula explained that it is important to understand how the condition was in the past and follow how the condition has changed over time. Dr. Arambula testified that it is the time span of records over time that allows him to describe what is happening in a person's life. According to Dr. Arambula, research on sex offenders has identified risk factors for sexually reoffending. The two biggest risk factors for sexual recidivism are sexual deviance and an antisocial personality. The severity of those two factors affects the risk of recidivism.

Dr. Arambula testified that in his expert opinion, Rodriguez is sexually deviant. Dr. Arambula explained that sexual deviance, or paraphilia, refers to an individual with abnormal sexual preferences, fantasies, or activities. Dr. Arambula determined that Rodriguez is sexually deviant based on his history of two convictions and other unadjudicated sexual offenses.

Dr. Arambula explained that Rodriguez has a criminal history of two convictions of sexual assault–both of which involved minors. Rodriguez was eighteen years of age when he committed his first criminal offense by sexually assaulting a thirteen-year-old girl. Dr. Arambula questioned Rodriguez about this conviction. Rodriguez stated that he and the girl had been at a party and had sexual intercourse, which resulted in a statutory rape conviction because the girl was underage. Thus, aside from the girl being underage, Rodriguez portrayed the encounter as consensual. However, in reviewing information contained in police investigative records and witness statements, Dr. Arambula learned that the thirteen-year-old girl had been abducted by Rodriguez and two other "guys," and Rodriguez sexually assaulted the girl while the other two "guys" held her down. When asked if the records indicated physical violence occurred, Dr. Arambula testified, "Yes, there was some punching, threats to harm her if she said anything; things like that." Dr. Arambula testified that the events described in the record was "obviously very different from" the version relayed by Rodriguez during his interview. Rodriguez's version involved consensual but illegal behavior due to the girl's age, while the version contained in the records showed abduction, rape, and physical violence. For this offense, Rodriguez was sentenced to five years of imprisonment and a fine of $500.00. His sentence was then suspended, and he was placed on probation for a term of five years. Dr. Arambula testified that Rodriguez's age at that time of this sexual assault is a risk factor because the earlier a person begins offending, the more serious their

sexual deviance. Further, Dr. Arambula explained that the victim being a stranger, or almost a stranger, was another risk factor.

Dr. Arambula also reviewed records relating to Rodriguez's conviction for aggravated sexual assault of a child. Rodriguez was arrested in 2008 for sexually abusing all four of his half-siblings, who ranged in age from three years to eight years. Rodriguez was indicted for aggravated assault of a child and indecency with a child by contact. Dr. Arambula testified that Rodriguez was accused of fondling his half-sister, compelling oral sex with his half-brother, and fondling and anally sodomizing a younger half-brother. The records showed that these offenses occurred over a two-month period. Rodriguez ultimately pled "no contest" to one lesser included count of aggravated sexual assault of a child and was sentenced to fifteen years of imprisonment.

According to Dr. Arambula, the records he reviewed showed that with regard to his actions against his half-siblings, Rodriguez used substantial physical violence, including (1) "spanking them or beating them with belts" and causing "abrasions or bleeding to the skin"; (2) using "paddles" and "boards"; (3) locking them out of the house; (4) not feeding them; (5) throwing objects at them; (6) locking them "in a cage"; (7) threatening to burn them; and (8) pouring lemon juice on one of them "who had cut his head open." Dr. Arambula testified that the investigative records showed that he threatened his eight-year-old half-sister and on one occasion "taped her to a bed and when she got out of it, he cut her cheek with a knife that he had." A teacher noticed the injury on the girl's face, which led to Rodriguez's arrest. The records also reflected that Rodriguez made the oldest half-brother touch the penis of the next in age half-brother. There was also anal penetration of the youngest half-brother.

When Dr. Arambula asked Rodriguez about this second offense, Rodriguez admitted to "an incident where he had been taking a prescription medicine to help him sleep and he was

drinking and he fell asleep, and when he woke up in the morning the kids were around him." Rodriguez "noticed that he had his hands down one of the half-brother's pants and he immediately retracted, took his hand back." Dr. Arambula testified that was the extent to which Rodriguez would admit in his interview to any actions that led to his second conviction. However, Dr. Arambula testified that he also reviewed Rodriguez's deposition where Rodriguez admitted to engaging in oral sex with his oldest half-brother.

Dr. Arambula testified that the offenses against Rodriguez's half siblings were similar to his earlier offense against the thirteen-year-old girl. In reviewing the records associated with the above offenses, Dr. Arambula testified there were five victims, which according to research, made the probability of Rodriguez reoffending "very high." Dr. Arambula was asked how the level of violence against the children during the sexual offenses affected his opinion. Dr. Arambula answered,

> Remember the initial one with [the thirteen-year-old girl] where the two guys held her down, it resembled [Rodriguez's half-sister] saying that she had been duct-taped to the bed. So, there was some similarity in those two victims. The violence in the background was, like I said, substantial, and I looked at it as somewhat separate because that's just pure unadulterated physical abuse. But looking at it as I prepped for this trial, it's a way of gaining compliance with the kids because they are afraid–like the violence could get worse– and so it's a very twisted kind of sadistic grooming approach.

According to Dr. Arambula, the fact that the first victim was older than his half siblings shows a regression:

> So, it's definitely a regression. An offense to [a] thirteen-year-old girl[], but if you can imagine what a thirteen-year-old girl looks like versus an eight-year-old girl versus a four-year-old or three-year-old boy, there's definitely a regression, and I'm talking about secondary sex characteristics. Some thirteen-year-old girls might look halfway developed and that physiologically, you know there's been some research that, that can look normally even though it's illegal. But when you look at younger children–and no offense to them–they are like stick figures. So, a girl looks like a

little boy if you look at their body because they don't have any secondary sex characteristics.

When asked why a regression was relevant, Dr. Arambula explained that "sometimes people lose their judgment when somebody is a minor and they look fairly mature as opposed to when somebody doesn't have any sex characteristics then that demonstrates how pathologic it is." Dr. Arambula explained that in addition to the age regression, Rodriguez's number of victims also increased. Dr. Arambula testified that having more than one victim significantly increases the risk for future recidivism—at least doubling the risk. Because Rodriguez has at least five victims, he is at a very high risk of reoffending. Further, Dr. Arambula explained that reoffending after being caught and punished is another risk factor for Rodriguez. Dr. Arambula further noted that Rodriguez's common-law wife had accused him of sexually assaulting her when he was about twenty years old but later recanted her statement.

Using the DSM, Dr. Arambula diagnosed Rodriguez with paraphilic disorder with features of pedophilia and sadism. Dr. Arambula explained that paraphilia generally refers to "abnormal sexual interests, fantasies, activities with individuals that are not normal or pathologic." Pedophilia refers to activities or fantasies involving children who are thirteen years of age and younger. According to Dr. Arambula, a paraphilic disorder is a congenital or acquired condition that can affect a person's emotional or volitional capacities, and when the disorder is severe and chronic, predispose the person to commit a sexually violent offense. Dr. Arambula explained that in diagnosing Rodriguez with the condition, it was significant that Rodriguez's half-siblings were eight years of age and younger. Dr. Arambula testified that (1) Rodriguez's disorder is severe and chronic; and (2) Rodriguez's denial of his condition is pervasive. When asked how Rodriguez could still have this condition when he had not sexually assaulted a child since he was imprisoned in 2014, Dr. Arambula explained:

So, when a paraphilia becomes chronic that means it typically does not go away like high blood pressure or diabetes or something like that. And so, the environment can affect how the condition behaves. What I'm taught to look for, particularly when there is a male in a male prison, are features of denial, blame, minimization– those kind of things–because that's part of the illness. When somebody has sexual deviance or paraphilia, almost all of them have pretty significant denial.

Dr. Arambula testified that in using the DSM, he also diagnosed Rodriguez with an unspecified personality disorder with antisocial features. Dr. Arambula explained that personality disorders describe a person's way of behaving and that antisocial people disregard the rights and well-being of others without remorse and refuse to accept responsibility for their own actions. When asked about Rodriguez's arrests for offenses that were nonsexual in nature, Dr. Arambula pointed to Rodriguez's arrests for injury to a child, assault with bodily injury, DWI, possession of marijuana, theft of property, unlawfully carrying a weapon, and evading arrest. When asked why he diagnosed Rodriguez with a personality disorder with antisocial features, Dr. Arambula pointed to the list of Rodriguez's nonsexual offenses and the "very little remorse or responsibility for what he has done." Dr. Arambula testified that Rodriguez was "pretty callous." According to Dr. Arambula, Rodriguez's antisocial personality traits are high, and his robust personality disorder raises his risk to sexually reoffend. Dr. Arambula testified that Rodriguez's personality disorder is a congenital or acquired condition that affects his emotional and volitional capacity and predisposes him to commit a sexually violent offense.

Dr. Arambula also took into consideration protective factors in making his evaluation. Protective factors are absent risk factors. The protective factors Dr. Arambula identified for Rodriguez included his good prison adjustment and his current sex offender treatment. Dr. Arambula explained that Rodriguez had also become more "spiritual" in prison and "[i]t looked like he was going to do better in" sex offender treatment, but then Dr. Arambula talked to Rodriguez's therapist, which changed Dr. Arambula's mind. Rodriguez repeatedly waffled in

treatment by admitting something and then retracting the statement. According to Dr. Arambula, the therapist felt like Rodriguez "was hiding things" from her and from the group. Anything that is being hidden is still part of Rodriguez's pathology. Dr. Arambula explained Rodriguez "hiding things during treatment" was a concern because "[i]f my patients keep secrets from me, it interferes with how they are going to progress." Dr. Arambula testified that Rodriguez does not currently have tools he needs to prevent himself from sexually reoffending.

Dr. Arambula testified that in his expert opinion, Rodriguez has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Rodriguez's convictions for sexual offending against two different children are evidence of his sexual deviance. Rodriguez's current level of denial and his poor progress in sex-offender treatment led Dr. Arambula to believe Rodriguez has not changed while sitting in prison. According to Dr. Arambula, the less structure Rodriguez is given, the worse he behaves. When asked whether Rodriguez was likely to commit a sexual violent offense to the extent that he is a menace to the health and safety of another person, Dr. Arambula replied that Rodriguez was likely to reoffend and that his risk of reoffending is high.

Rodriguez also testified. His current support system is his mother, sister, and brother. According to Rodriguez, when he was seventeen years old, he was arrested for injury to a child. Rodriguez denied any wrongdoing and stated that the alleged victim recanted her statement.

Rodriguez testified about his first conviction, stating that when he was eighteen years old, he was arrested for sexually assaulting a minor. He denied physically hitting or threatening the victim, but nonetheless admitted to forcing his penis into her vagina and being subsequently convicted of sexual assault and sentenced to five years of probation. He successfully completed that probation.

During his late teens, Rodriguez lived with his common-law wife and was arrested for assaulting her and causing her bodily injury. He admitted to having an "altercation with her" because he believed she was cheating on him. He denied hitting the woman in the face and causing her injury, testifying that she had locked herself in a room and he kicked down the door. According to Rodriguez, "The door hit her." Rodriguez was convicted of assault and placed on six months of probation. A few years later, the same woman accused Rodriguez of sexually assaulting her.

During this same period, Rodriguez passed a bad check, was convicted, and was given another six months of probation. He was also arrested for possessing marijuana and sentenced to six months of probation. Rodriguez admitted to this offense but accused the police officer of trespassing on private property to reach him.

With regard to his half-siblings, Rodriguez testified that when his father went to prison, he began to spend a lot of time with his half-siblings. Rodriguez admitted that he was frequently intoxicated when he was at their home, but denied having sexually abused his half-siblings. When asked if he cut his half-sister's face with a knife, he replied that "[s]he ran into a tree limb." He denied having one of his half-brothers fondle his penis but changed his testimony when confronted with his previous deposition. Rodriguez admitted he had forced his half-brother to fondle and suck his penis. He denied hitting the children, claiming he "disciplined" two of the children "[w]ith the belt in the presence of their mother at her request." He denied killing one of his half-sibling's puppies, stating that the puppies "were already dead" and he "threw them in the fire and burned them because the first time that [he] buried them the dogs dug them back up." Rodriguez admitted that he was having a sexual relationship with the mother of his half-siblings and that their mother was still married to his father at the time. He also admitted that he had been charged for sexually assaulting all his younger half siblings, ultimately pleaded nolo contendere to one lesser-included

offense of aggravated sexual assault of a child, and was sentenced to fifteen years of imprisonment in accordance with his plea-bargain agreement. Despite having entered into a plea-bargain agreement, Rodriguez "den[ied] most every aspect of the sexual abuse and every aspect of the physical abuse."

Before pleading nolo contendere to the offense against his half-brother, Rodriguez was arrested for unlawfully carrying a weapon and for driving while intoxicated. He was convicted of driving while intoxicated and was placed on probation for six months. While on probation, he tested positive for methamphetamines and failed to complete the required DWI education program. Thus, his probation was revoked, and he was confined in jail. Shortly after being released from jail for his DWI offense, Rodriguez was arrested for stealing a women's purse and for evading arrest.

Rodriguez testified that he was younger than ten years old when he first tried alcohol and was regularly drinking alcohol by the age of twelve. He admitted to being a heavy drinker, stating that he had quit drinking for a few years but then began drinking heavily again and combined alcohol with narcotics. He testified he began smoking marijuana as a teenager and had used cocaine. He had never participated in substance abuse treatment but believed treatment would be a positive thing.

Since 2012, Rodriguez has been confined in jail and then prison. At the time of trial, he was close to completing the Texas Department of Correction's nine-month sex offender treatment program. Rodriguez testified that he has identified two of his "thinking errors" as (1) believing it was okay to drink on Friday because he deserved it for working hard all week; and (2) believing it was okay to sexually offend against others because it had happened to him. He identified his triggers as boredom and the "lack of nonsexual activities such as sports or entertainment." He agreed that pornography could also be one of his triggers. He testified that he intends to avoid

sexually reoffending by keeping himself "productive and active on activities and stay[ing] busy working." He also planned to be "vigilant" of whom he was around and with whom he had relationships.

When asked what would be a high-risk situation for him, Rodriguez replied being at an event where there are unsupervised children. Rodriguez admitted that he was not innocent of his offenses and had two victims. However, he claimed he was not sexually aroused by children. When asked why he had then forced his half-brother to "suck [his] penis" and fondle him, Rodriguez answered that it was only for his own "self-gratification." When asked to tell the jury about his offense cycle against his half-brother, he replied that he "prefer[red] to do those things only in therapy." When asked to explain to the jury his offense cycle pertaining to his first offense against the thirteen-year-old girl, Rodriguez replied,

> So, the thought was we are going to have a party. She came over. I saw her. I knew that she was on a rebound and I was on a rebound. I knew we were both vulnerable. The plan set up was I could take advantage of that situation. So, then I isolated her, got her alone and brought her into the room where I sexually assaulted her. At the time I was feeling good about what I was doing. I didn't feel bad until afterwards [when] I felt regret. I felt remorse because I knew that I wasn't—we weren't going to be like all right with it and I made promises that I wouldn't do that again. That's basically it.

When asked what specific promise he made to not do again, Rodriguez replied, "I wouldn't cheat on my then girlfriend. Especially on a blind hookup like that." Rodriguez was asked whether he was dating someone at the time, and he replied that he was. Rodriguez was then asked to clarify whether he considered his actions toward the thirteen-year-old girl to be consensual. Rodriguez testified, "I believe[d] that it was consensual but I realize now because of her age that she didn't have the ability to consent so I know that it's wrong." Rodriguez was asked whether the thirteen-year-old girl "was going along with it," and Rodriguez replied that she was. Rodriguez did admit that when he forced his penis into his half-brother's mouth, his half-brother "[s]eemed angry and

confused." However, Rodriguez denied having any offense cycle with respect to his other half-siblings. According to Rodriguez, his risk of reoffending was "moderate."

In his brief, Rodriguez points to his counsel's cross-examination of Dr. Arambula and argues that based on that cross examination, Dr. Arambula's testimony should be considered conclusory. The State replies that although Rodriguez couches his argument in terms of Dr. Arambula's testimony being conclusory, the substance of Rodriguez's arguments relate to Dr. Arambula's methodology and the underlying facts or data. The State emphasizes that Rodriguez has waived these type of arguments by not objecting to the reliability of Dr. Arambula's testimony in the trial court. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (explaining that "when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis"). We agree with the State that any argument about the reliability of Dr. Arambula's expert opinion has been waived by Rodriguez.

We note that in arguing that Dr. Arambula's testimony was conclusory, Rodriguez points to his cross-examination of Dr. Arambula where he questioned Dr. Arambula about certain records Dr. Arambula did not review. This cross-examination, however, did not make Dr. Arambula's "conclusory." Instead, the parts of Dr. Arambula's testimony that Rodriguez points to in his brief go to the weight and credibility of Dr. Arambula's testimony, which is the sole province of the jury. *See In re Commitment of Stoddard*, 619 S.W.3d at 674. We may not substitute our judgment for that of the jury. *See id.* at 677. Based on this record, we conclude that the evidence is legally sufficient to support a finding beyond a reasonable doubt that Rodriguez has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re*

*Commitment of Gibbs*, No. 09-21-00232-CV, 2023 WL 5486229, at *7 (Tex. App.—Beaumont Aug. 24, 2023, no pet.).

With regard to factual sufficiency, we note that Rodriguez denies many of the actions for which he was accused. However, as noted, it is the jury's sole province to judge the weight and credibility of Rodriguez's testimony and Dr. Arambula's testimony. *See In re Commitment of Stoddard*, 619 S.W.3d at 674. The jury was free to disbelieve Rodriguez's denials. *See In re Commitment of Gibbs*, 2023 WL 5486229, at *7 ("[E]ven though Gibbs contradicted some of Reed's testimony, the jury was free to disregard his testimony."). Further, it is undisputed that Rodriguez has two convictions for sexual offenses, many convictions for non-sexual offenses, and violated the terms of probation in multiple ways. It is also undisputed that Rodriguez does well with a structured environment and not well without one. When all the evidence is considered, we conclude that the disputed evidence a reasonable factfinder could not have credited in favor of the finding that Rodriguez is a sexually violent predator, along with undisputed facts contrary to that finding, is not so significant that the factfinder could not have found beyond a reasonable doubt that Rodriguez has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See In re Commitment of Stoddard*, 619 S.W.3d at 678. Thus, we hold the evidence is also factually sufficient to support the jury's finding that Rodriguez is a sexually violent predator.

### ADMISSIBILITY OF EVIDENCE

Rodriguez also argues the trial court abused its discretion in admitting evidence of unadjudicated offenses over his objections pursuant to Texas Rules of Evidence 403 and 705(d).

> A. *Which parts of Dr. Arambula's testimony was objected to and preserved for appellate review?*

As noted previously, Rodriguez was arrested for sexually assaulting all four of his half-siblings, who ranged in age from three to eight years of age. Rodriguez was indicted for offenses relating to all four children, including fondling a half-sister, compelling oral sex with a half-brother, and fondling and anally sodomizing another half-brother, all of which occurred over a two-month period. Rodriguez ultimately pled "no contest" to one lesser-included count of aggravated sexual assault of a child.

At trial, Dr. Arambula was asked "what specific sexual actions took place against" Rodriguez's half-siblings. Defense counsel made a hearsay objection and objected under Rules 403 and 705. The trial court overruled the objection, and Dr. Arambula replied, "So the investigative records, or actually, the indictment showed fondling with a half-sister. There was oral sex with one of the half-brothers. Fondling and anal sodomy with the other younger half-brother." Dr. Arambula was then asked "what sorts of things did [Rodriguez] do to" his half-siblings. Defense counsel again made a hearsay objection and objected under Rules 403 and 705. The trial court overruled the objections, and Dr. Arambula answered,

> So, there were incidents of [Rodriguez] spanking them or beating them with belts. Some had some metal so there were abrasions or bleeding to the skin. Paddles, boards. He locked them out of the house. Wouldn't feed them. Threw things, objects at them. Locked them in a cage. Threatened to burn them. Poured lemon juice on one of the youngsters who had cut his head open. It was pretty substantial.

In his brief, Rodriguez also complains about Dr. Arambula (1) describing "a knife being used as part of one of the sexual assaults, though this was not charged," (2) testifying the youngest half-sibling "in the investigative records said that Mr. Rodriguez made the oldest half-brother touch the next to the oldest half-brother," and (3) testifying that Rodriguez had threatened to kill or harm the children. Rodriguez, however, made no objection while Dr. Arambula testified to these three areas (other than to the threat to burn the children as described above); nor does Rodriguez

in his brief point to where he made a running objection. *See Volkswagen v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (explaining that the "general rule is error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection" but that a party can preserve error by obtaining a running objection); *see also* TEX. R. APP. P. 33.1(a) (requiring timely objection and ruling to preserve error for appeal). Thus, any error relating to Dr. Arambula's testimony about the knife being used, Rodriguez forcing one half-sibling to touch another half-sibling, and Rodriguez threatening to kill or harm the children (other than the threat to burn them) have not been preserved for appellate review. *See Ramirez*, 159 S.W.3d at 907.

Later during his testimony, Dr. Arambula was asked about what "various things" Rodriguez has "been arrested for that were nonsexual in nature." Without objection by the defense, Dr. Arambula answered,

> When he was a teenager, there was an arrest for an injury to a child, and I think that actually happened before the aggravated sexual assault involving the young girl. There w[as] also assault of bodily injury that was with [Rodriguez's common law wife]. We talked about the alleged rape [that] she recanted. He had a DWI, theft of property, possession of marijuana, unlawfully carrying a weapon, [and] evading arrest. I think that covers it.

As the defense did not object to this testimony, any error related to it is waived. *See id*. Dr. Arambula was asked whether any of those nonsexual offenses had particular significance. Dr. Arambula answered that "[t]here were a couple that stood out. The injury to a child." Dr. Arambula was then asked, "Can you explain to the jury what happened with the injury to a child." At that point, the defense objected to "hearsay, relevance, and 403 balancing." The trial court overruled the objection, and Dr. Arambula replied,

> These come from the investigative records involving the arrest and nothing happened with this, but it was basically a young girl who was walking home. I think

there were two or three guys [who] jumped her, and then they carved a pentagram in her stomach and then took off.

When asked if Rodriguez was one of the individuals, Dr. Arambula stated that he was. Dr. Arambula pointed to the nonsexual offenses as indicative of antisocial traits.

Thus, Rodriguez has preserved for appellate review his complaints to Dr. Arambula's testimony about incidents of Rodriguez "spanking [his half-siblings] or beating them with belts," which caused "abrasions or bleeding to the skin," locking them out of the house, not feeding them, throwing objects at them, locking them in a cage, threatening to burn them, and pouring lemon juice on his half-sibling's open cut. He also preserved for appellate review his complaints to Dr. Arambula testifying that the investigative records showed "fondling with a half-sister," "oral sex with one of the half-brothers," and "[f]ondling and anal sodomy with the other younger half-brother." Finally, Rodriguez preserved for appellate review his complaints to Dr. Arambula testifying about Rodriguez, along with other "guys," "jumping" a young girl who was walking home and carving a pentagram into her stomach.

### B. Texas Rules of Evidence 403 and 705

On appeal, Rodriguez argues the trial court erred in overruling his objections under Rules 403 and 705 to the above evidence. In a sexually violent predator commitment case, whether a person has a behavioral abnormality is the ultimate issue to be determined by the jury. *See In re Commitment of Bohannan*, 388 S.W.3d 296, 305 (Tex. 2012) ("In SVP commitment proceedings, the only fact issue to be resolved by the trier-of-fact is whether a person has the behavioral abnormality required for an SVP."). Thus, the details of unadjudicated offenses an expert reviewed and relied upon are generally admissible to allow the jury to determine the weight and credibility to give the expert's opinion on whether the person has a behavioral abnormality. *In re Commitment of Johnson*, 613 S.W.3d 613, 617, 619 (Tex. App.—San Antonio 2020, pet. denied).

Rule 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed." TEX. R. EVID. 703; *see In re Commitment of Baiza*, 633 S.W.3d 743, 752 (Tex. App.—Houston [14th Dist.] 2021, no pet.). "The underlying facts and data need not be admissible for the opinion to be admitted." *In re Commitment of Baiza*, 633 S.W.3d at 752. "Under Rule 705, experts may disclose such facts and data on direct examination or be required to disclose them on cross-examination, and they may discuss prior offenses as part of the basis for their opinions, including the details of other sexual assaults even if they are unadjudicated." *Id*. (citing TEX. R. EVID. 705(a)). "Thus, even otherwise inadmissible hearsay may be admissible under Rule 703." *Id*. at 752-53. "But Rule 705 prohibits the proponent of the opinion from disclosing inadmissible facts or data 'if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect.'" *Id*. at 753 (citing TEX. R. EVID. 705(d)).

"Unadjudicated offenses are not necessarily more prejudicial than probative when they explain the basis of an expert's opinion." *Id*. Many appellate courts, including this court, have upheld a trial court's decision to allow an expert to testify about the details of unadjudicated offenses in sexually violent predator commitment cases. *See id*. (holding that trial court could have reasonably concluded evidence relating to the respondent's unadjudicated offenses would be helpful to the jury in weighing the expert witness's testimony regarding the basis of his expert opinion); *In re Commitment of Guest*, 02-19-00295-CV, 2021 WL 1245087, at *8-9 (Tex. App.—Fort Worth Apr. 1, 2021, pet. denied) (holding trial court did not abuse its discretion by admitting evidence of unadjudicated sexual offenses because admission was not unfairly prejudicial); *In re Commitment of Johnson*, 613 S.W.3d at 619 (emphasizing that details of the respondent's unadjudicated offenses contributed to the expert witness's diagnosis of pedophilia and that

"testimony about the underlying facts helped the jury weigh his diagnosis in order to decide whether they agreed that [the defendant] had a behavioral abnormality that would predispose him to commit sexual offenses" and holding "the trial court did not abuse its discretion by concluding that the evidence was admissible and would not be unfairly prejudicial"); *In re Commitment of Renshaw*, 598 S.W.3d 303, 314 (Tex. App.—Texarkana 2020, no pet.) (explaining that "[i]n civil commitment cases, evidence of uncharged sexual offenses, when it is used by experts, is highly probative and helpful to the jury in explaining the basis of the expert's opinion that a person has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence," and "[f]or this reason, experts in civil commitments may disclose the underlying facts that the expert relief on including the details of adjudicated and unadjudicated sexual assaults") (internal quotation omitted); *In re Commitment of Grice*, 558 S.W.3d 323, 328 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (emphasizing that "[e]vidence concerning the facts underlying alleged previous sexual assaults has been ruled admissible in civil commitment cases when it assists the jury in understanding an expert's testimony that the person has a behavioral abnormality" and holding the trial court did not abuse its discretion by admitting evidence of two offenses that were originally charged as sexual offenses but were subsequently reduced to nonsexual offenses because admission was not unfairly prejudicial); *In re Commitment of Stuteville*, 463 S.W.3d 543, 555-56 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (holding trial court did not abuse its discretion in determining evidence of uncharged sexual offenses to explain basis of expert's opinion that defendant suffered from behavioral abnormality was not unfairly prejudicial).

Like Rule 705, Rule 403 allows for the exclusion of relevant evidence if its "probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" TEX. R. EVID. 403. "Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made

on an improper basis, commonly, but not necessarily, an emotional one." *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied). "In *Montgomery v. State*, the Texas Court of Criminal Appeals created criteria for evaluating whether the danger of unfair prejudice substantially outweighs the probative value of the proffered evidence." *In re Commitment of Basquez*, 669 S.W.3d 823, 829 (Tex. App.—Dallas 2023, no pet.) (citing *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim. App. 1990) (op. on reh'g)). Texas courts have applied a modified version of the *Montgomery* test in sexually violent predator commitment cases to address the admission of evidence of unadjudicated offenses. *Id.*; *see also In re Commitment of Renshaw*, 598 S.W.3d at 314-15; *In re Commitment of S.D.*, No. 10-17-00129-CV, 2020 WL 103721, at *5 (Tex. App.—Waco Jan 8, 2020, no pet.); *In re Commitment of Flores*, No. 13-17-00258-CV, 2018 WL 1755876, at *4 (Tex. App.—Corpus Christi-Edinburg Apr. 12, 2018, no pet.); *In re Commitment of Stuteville*, 463 S.W.3d at 555; *In re Commitment of Ford*, No. 09-11-00425, 2012 WL 983323, at *2 (Tex. App.—Beaumont Mar. 22, 2012, no pet.). Under this modified *Montgomery* test, we consider the following: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Commitment of Basquez*, 669 S.W.3d at 829. "[W]hen the record reveals one of more such relevant criteria reasonably conducing to a risk that the probative value of the tendered evidence is *substantially outweighed* by unfair prejudice, then an appellate court should conclude that the trial court acted irrationally in failing to exclude it, and thus abused its discretion." *Montgomery*, 810 S.W.2d at 393 (emphasis added).

### C. Application

Rodriguez argues that the relevance of Dr. Arambula's testimony about "extraneous acts of violence by Rodriguez against his half siblings" was minimal compared to its prejudicial effect.

Rodriguez further complains that the allegation of carving a pentagram on a young girl's abdomen was unfairly prejudicial because Dr. Arambula also testified he reviewed documents stating that the girl had recanted this allegation against Rodriguez. We disagree with Rodriguez's argument that Dr. Arambula's testimony was of minimal relevance.

Dr. Arambula testified that based on his expert training, he must consider both adjudicated and unadjudicated allegations but weigh them differently. Dr. Arambula explained,

> [P]er my training I'm taught to attach the heaviest weight to convictions regarding sexual offenses. And if there are allegations of sexual conduct or offenses, then I'm a physician so I look at that as clinical evidence. I'm also taught not to attach as much weight. Some are dismissed, some are plea bargained out, but I nevertheless, still consider them, especially if they resemble what the convictions are.

Dr. Arambula further explained that "[f]rom a clinical perspective," it would not be appropriate to ignore additional allegations that did not result in a conviction because to determine "how a medical condition behaves over time," one must review "a compilation of records over time that describes what's happening." With regard to evidence of the incidents concerning Rodriguez's half-siblings that were ultimately not adjudicated because of Rodriguez's plea bargain, Dr. Arambula testified that he relied on evidence relating to these unadjudicated offenses in forming his expert opinion that Rodriguez suffered from a behavioral abnormality. With regard to the other allegation about carving the pentagram, Dr. Arambula testified that he relied on evidence related to allegations of unadjudicated offenses as indicative of antisocial traits. According to Dr. Arambula, review of older information and past offenses, whether or not they lead to a conviction, is important to determine "if the sexual deviance or paraphilias can be chronic." Dr. Arambula testified that it is "important to understand how the condition was in the past and follow how it [has] changed over time." Dr. Arambula explained that it "is the time span of records over time" that allows him "to describe what's happening in a person's life." The evidence of the

unadjudicated offenses was therefore probative to the jury's determination of the weight and credibility to give Dr. Arambula's opinion that Rodriguez has a behavioral abnormality. *See In re Commitment of Johnson*, 613 S.W.3d at 619.

With regard to the potential of the evidence to impress the jury in some irrational way, Dr. Arambula testified from where he obtained the information and how much weight he gave the information he obtained. As noted, he explained that he did not attach as much weight to unadjudicated offenses. Instead, he testified he looked for patterns in Rodriguez's behavior over time. With regard to the allegation about the young girl and the pentagram, Dr. Arambula testified that according to the records he reviewed, the young girl had recanted the testimony. Thus, the jury did hear that the allegation had been recanted by the young girl. According to Dr. Arambula, when he asked Rodriguez about the incident, Rodriguez "talked about a tattoo that either he did it or she did it herself or asked for it or something to that regard." Dr. Arambula was asked whether he was "counting" this alleged offense against Rodriguez. Dr. Arambula replied that "it did stick out because of how similar [the incident] was to the rape involving [B.] where there were—where she was met by boys and then they basically assaulted her. So it was that resemblance." Thus, the jury was given the parameters for which Dr. Arambula considered the unadjudicated offenses and how much weight he gave those unadjudicated offenses in forming his expert opinion that Rodriguez had a behavior abnormality. Further, these allegations of unadjudicated offenses were not nearly as graphic as the details of Rodriguez's adjudicated offenses. Thus, we cannot conclude that the evidence impressed the jury in some irrational way.

Finally, in reviewing the record, the State did not need much time to develop this evidence, and the State had need for the evidence to explain how Dr. Arambula formed his expert opinion that Rodriguez had a behavioral abnormality. *See In re Commitment of Baiza*, 633 S.W.3d at 752;

*In re Commitment of Guest*, 2021 WL 1245087, at \*8; *In re Commitment of Johnson*, 613 S.W.3d at 618; *In re Commitment of Renshaw*, 598 S.W.3d at 314; *In re Commitment of Grice*, 558 S.W.3d at 328; *In re Commitment of Stuteville*, 463 S.W.3d at 555-56. Thus, because the record does not reflect that the probative value of the evidence was *substantially outweighed* by the danger of unfair prejudice under Rules 403 and 705, we hold the trial court did not abuse its discretion in overruling Rodriguez's objections.

### LIMITING INSTRUCTION

In his final issue, Rodriguez argues the trial court abused its discretion in failing to give a contemporaneous Rule 705(d) limiting instruction. During Dr. Arambula's testimony, Rodriguez requested the jury be given a limiting instruction under Rule 705. The trial court denied the request "for now" and stated that the instruction would be included in the jury charge. Indeed, the Rule 705(d) limiting instruction was included in the jury charge.

Nevertheless, Rodriguez argues the trial court erred in not giving the instruction at the time Dr. Arambula testified. In support of his argument, he cites *Hammock v. State*, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001), for the proposition that "jury instructions, if requested, should be given when the evidence is admitted and then again at the final jury charge." Rodriguez recognizes that *Hammock* involved the timing of a Rule 105(a) extraneous offense limiting instruction, a rule he did not invoke in the trial court, but argues that the "logic" behind the analysis in *Hammock* should apply to Rule 705(d) requests.

Rule 705(d) provides,

> If the underlying facts or data would otherwise be inadmissible, the proponent of the opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect. If the court allows the proponent to disclose those facts or data the court must, upon timely request, restrict the evidence to its proper scope and instruct the jury accordingly.

Rule 705(d) does not explicitly state when the limiting instruction should be given. In considering the same argument as brought by Rodriguez, courts have held that the trial court must be made aware that the party was requesting a contemporaneous limiting instruction be given to the jury. *See In re Commitment of Ballard*, No. 10-23-00020-CV, 2023 WL 3997139, at *1 (Tex. App.—Waco June 14, 2023, no pet.); *In re Commitment of Smith*, No. 10-22-00254-CV, 2023 WL 3509652, at *2 (Tex. App.—Waco May 17, 2023, pet. denied). The State relies on these authorities and argues that Rodriguez has failed to preserve error for review.

Without deciding whether Rodriguez's objections to the trial court were sufficient to make the trial court aware that he was objecting to the lack of a contemporaneous instruction, we conclude that any error in failing to give such a contemporaneous instruction was harmless. *See* TEX. R. APP. P. 44.1(a)(1) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment[.]"). Unless the record demonstrates otherwise, we must presume the jury followed the instruction it received. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003); *see also Rankin v. State*, 995 S.W.2d 210, 214-15 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (concluding that delayed jury instruction was harmless error when the record did not reflect the jury ignored the instruction). The instruction given in the jury charge was specific and applied to "information contained in records reviewed by an expert" that was "admitted before [the jury] through expert testimony." Dr. Arambula was the only expert who testified, thus making it clear to the jury which expert was being referenced in the jury instruction. Further, there is no evidence to show that the jury formed an opinion before it was given the limiting instruction in the jury charge. *See id.* at 215 (holding delayed limiting instruction was harmless because there was "no evidence to show the jury formed an opinion prior

to the time it began its deliberation"). Finally, during Dr. Arambula's testimony, there were repeated questions and answers explicitly stating where the information came from and how Dr. Arambula used those records in forming his expert opinion. His testimony was clear that some of the allegations he reviewed and relied upon did not lead to convictions. We thus hold that any error by the trial court in failing to give a contemporaneous instruction under Rule 705(d) was harmless.

## CONCLUSION

For the reasons stated above, we affirm the trial court's judgment and order of commitment.

Adrian A. Spears II, Justice